# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs November 8, 2012

## IN RE: HOPE A. P.

**Appeal from the Circuit Court for Greene County**
**No. 11A038(TJW)    Thomas J. Wright, Judge**

---

**No. E2012-00686-COA-R3-PT-FILED-DECEMBER 3, 2012**

---

This appeal concerns a termination of parental rights. Sean and Amber G. ("the Petitioners") filed a petition for adoption and termination of parental rights with respect to Hope A.P. ("the Child") against Jessica N. ("Mother") in the Circuit Court for Greene County ("the Trial Court"). The petition alleged that Mother willfully failed to visit or support the Child in the four month period immediately preceding the filing of the petition. The Trial Court terminated Mother's parental rights to the Child after finding that Mother's willful failure to support had been proven by clear and convincing evidence, and that clear and convincing evidence showed that it was in the Child's best interest for Mother's parental rights to be terminated. Mother appeals to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Jennifer Luther, Greeneville, Tennessee, for the appellant, Jessica N.

E. Ronald Chesnut, Greeneville, Tennessee, for the appellees, Sean G. and Amber G.

## OPINION

## Background

On February 25, 2011, the Petitioners filed a petition for adoption of the Child and termination of Mother's parental rights to the child. The Petitioners alleged that they had intermittently shared their home with the Child since her birth and were the fit and proper individuals to have custody of the Child. The Petitioners further alleged Mother's willful failure to support and visit during and before the four month period immediately preceding the filing of the petition as grounds for termination of Mother's parental rights. The petition also sought to terminate the parental rights of Daniel P. ("Father") to the Child on the same grounds.[1] Mother contested the petition. Trial was held in February 2012.

Amber G., one of the Petitioners, testified. Along with her husband, Sean G., Amber G. sought to adopt the Child. The Child was born in October 2007. Amber G. knew Mother because Mother's mother and Amber G.'s uncle were a couple. Amber G. testified that, shortly after the Child's birth, Mother brought the Child to the Petitioners, and gradually, the Petitioners took on more and more responsibility for the Child. By 2008, the Child effectively was with the Petitioners "all the time." Amber G. testified that in the year leading up to her filing a petition for custody of the Child in juvenile court in October 2010, the Petitioners took care of the Child around 90% to 95% of the time. Amber G. testified that the Petitioners had taken the Child to the doctor when she had been sick, and generally had tended to her welfare in what effectively was Mother's near total absence. Regarding financial assistance from Mother, Amber G. testified that she had received no aid prior to the filing of the petition in this case, and that Mother has in fact said "[I] will not pay." Amber G. testified: "I know that we've always provided diapers for [the Child], wipes, her clothes, her underwear, her shoes, anything that she wears, and everything that goes in her stomach, we - - me and my husband have provided for her." Amber G. testified that she had an "awesome" relationship with the Child. Amber G. stated that the Child attended a private school and that the Petitioners paid the tuition. Amber G. testified that Mother had not properly kept the Child clean in the past. In contrast, Amber G. described the Child's condition now: "She's doing excellent. She loves going to school. She loves being in our home. She's comfortable there."

Sean G., the other Petitioner in this case, testified. Sean G.'s testimony largely mirrored that of Amber G. Sean G. testified that he had not received any kind of support from Mother for the Child. Sean G. acknowledged that Mother occasionally brought the Child a snack or drink during a visit. Sean G. stated that in the year prior to the filing of the

---

[1]Father surrendered his parental rights to the Child and is not a party on appeal.

custody petition in juvenile court, he and his wife had physical custody of the Child for about 90% to 95% of the time. Regarding the Child's integration into this family, Sean G. testified that the Child was a close and deeply loved part of the family.

A host of other individuals testified to the effect that the Child grew to spend the vast majority of her time with the Petitioners. After a string of such witnesses, the Trial Court remarked correctly that "[i]t's getting pretty cumulative at this point."

Mother, 24, testified that she was the mother of the Child, as well as the Child's sister, Scarlet P. ("Scarlet"). Mother testified to the efforts she made to find a job in the four months immediately preceding the filing of the petition to terminate parental rights, stating: "I called around to see if they would hire someone that was pregnant, and if so, would they hire someone with my disability, 'cause some places won't hire people with a reading or spelling comprehension disorder." Mother stated that she focused on fast food establishments in her job search. Previously, Mother had worked at Backyard Burger, Walmart, Ingles, and ACT. Mother testified that she failed to find a job, as "[the potential employers] told me that due to my pregnancy they would not hire me for the fact I would have to go on maternity leave not far after I started." Mother also stated "I'm on a fifth grade reading level, and I can't remember the spelling level exactly. The last time - - I do believe the last time I was tested it was third grade." Mother testified that during the four month period at issue, she visited with her daughter.

Mother lived with her mother, her mother's boyfriend, and her younger daughter, Scarlet. Mother stated that in the past she had not been much of a house cleaner but that she had since improved. Mother acknowledged that there was a roach problem in a previous home. Mother testified that she was making efforts to find alternative housing. Mother stated she was on a wait list for the Greenville Housing Authority. Regarding income, Mother testified that she was on "Family First." Mother also stated she was supposed to be receiving child support from Father but was not. Mother had applied for disability but had received no word back as of trial. Mother described her disabilities as "manic bi-polar," reading and spelling disorders, and a back problem.

On cross-examination, Mother explained why she had left the Child with the Petitioners: "Amber and Sean - - Amber was unemployed at the time. Sean was working. I can't remember where he was working. They started babysitting my daughter so I could go back to work at Backyard Burger." Regarding why Mother left the Child with the Petitioners in the manner in which she did, Mother testified that she felt controlled by Father. Specifically, Mother testified that Father "would twist things around" and made her feel like it was her fault he cheated on her.

With respect to financial support, Mother stated that she once gave $20.00 to Amber's father. Mother stated that she did not know prior to trial where the Child went to school. Mother stated that she did not pay any child support to the Petitioners for taking care of the Child " 'cause they never asked." Mother did not produce any documentation regarding her alleged medical conditions. When asked if she contributed any money for the Child during the relevant time frame, Mother answered that she had not, but that she had brought some clothes over. Mother testified that she smoked cigarettes.

Courtney Hambel ("Hambel") testified. Hambel was a case manager with Frontier Health. Hambel had worked with Mother to assist her. Hambel testified that she helped Mother achieve certain goals, like earning a driver's license, which Mother achieved. Hambel testified that Mother had an income from Families First. Hambel stated that Mother "told me she's applied for jobs," but Hambel could not specify when Mother applied for these jobs. Hambel acknowledged that she began working with Mother around March 2011, which was after the petition to terminate parental rights had been filed.

In March 2012, the Trial Court entered its final order terminating Mother's parental rights to the Child on the basis of willful failure to support in the four months immediately preceding the filing of the petition to terminate parental rights.[2] The Trial Court did not, however, find that the ground of abandonment by willful failure to visit had been proven. In its ruling from the bench incorporated into its final order, the Trial Court found and held, in relevant part:

> In this particular case, as the prior opinion discussed by counsel for [Mother] has pointed out, there are kind of four elements of - - that there is to support. Number one - - being aware of the duty. There's no question about that in this case. Number two - - having the capacity to provide support. Mom has attempted to contend that she wasn't able to provide support because she had become pregnant and couldn't find a job, and the Court just doesn't believe that. There's no question she got pregnant at some point during those four months, but the only - - absolutely only support for her assertion is her own testimony, which the Court doesn't believe regarding attempts to obtain employment. There wasn't a single job application presented to this Court. There wasn't a single turn-down letter saying, "You didn't get a job." There wasn't a single potential employer testifying about turning down the

_____

[2]The Trial Court, in its preliminary remarks while ruling, misstated the applicable four month window of time for purposes of the willful failure to support ground. The Trial Court stated: "[T]he petition was filed February 25, 2011, which starts our four month clock back in October of 2011." It appears evident to us that the Trial Court meant October of 2010, and that is how we interpret the Trial Court decision.

-4-

defendant's application for a job. In short, there was absolutely no corroboration of it, and it certainly wasn't unusual, based upon the testimony of [Mother's] work history for her to go without employment for whatever reason. As I probably had already indicated, the Court puts no stock in the allegation that she is disabled from working. You're absolutely not disabled from working. They need to make me the ALJ for the Social Security Administration. Twenty-six years old, you've got some potential, I guess. A mental health issue that's been addressed with medication - - that's a common - - commonly diagnosed and treated condition these days that doesn't prevent people from working. It certainly didn't ever prevent you from working when you had your few jobs before, nor did your alleged reading disability prevent you from working when you had your few jobs that you've had in the past. There's no medical proof as to any alleged back injury - - just, again, your own testimony. The Court finds it incredible, and doesn't believe it, and finds that you aren't disabled - - by clear and convincing evidence that you're not disabled - - that you need to get off your hind end and go to work like the rest of us. And therefore, I make the finding by clear and convincing evidence that you do have the capacity to provide support. I also base that decision on the fact that you were able to continue to find money to use on tobacco. You were able to continue to find a way to provide for yourself. For the record, [Mother] has no appearance of being a prisoner of war. She doesn't appear to have missed any meals. She's certainly ab - - has been providing plenty to eat, what she needs to smoke, and a roof over her head in some way. There's also proof that she had an income from Families First during the time that's in question. So the Court finds, based on all those facts, that there certainly was a capacity to provide. I don't think there's any question that there was no attempt - - no attempt - - to provide any support during the four months in question, and so the only real issue is, is there a justifiable excuse? Is there a justifiable excuse for choosing to satisfy our own hunger, or our own desire, or our own vice, to enjoy our own necessities, while foregoing just providing a dime of support to provide the necessities of life for a child who cannot provide for herself? I say, "No," - - not when there's nothing wrong with you, not when you're able to go smoke and take care of yourself, and not lose any weight. I say, "No." I say there's no justifiable excuse for that, and that's my finding by clear and convincing evidence in the facts of this case. You didn't have any medical testimony about the pregnancy - - when medical treatment for that may have started - - when anything regarding that happened. But assuming a nine-month gestation period, the pregnancy would have occurred in October, and obviously you didn't know it at the time for at least a few weeks. I doubt if it happened in October, although - - I guess - - I can't say by clear and

-5-

convincing evidence that it happened later than that, but because you smoked during the pregnancy, and because we know that smoking - - smokers tend to have more premature babies, and because this was your second child, and because we know that usually the second child comes earlier than the first child, I doubt that you were pregnant in October. Even if you were, there was nothing that kept you from working. There's absolutely no proof in the record regarding that, except, again, your testimony - - which I found to be unbelievable. And so, based upon those findings, the Court says that there's clear and convincing evidence that there's no justifiable excuse for your failure to provide one cent of support for this child, and that that clearly indicates under these circumstances your willful abandonment of the child. This child, as I said, was abandoned four years ago. You can't change that now. It doesn't matter what you did. The child will always know you, but they already became the Mom and Dad of this child over the last four years. I can't make that not be true or be true, no matter what I rule, but - - because that is a fact. Moving to the second prong of the decision I have to make. As I've already indicated, it's easy to make the decision that it's in the best interest of the child that your parental rights be terminated. Because after four years - - and one of the friends of Mr. and Mrs. [G.] made a reference to the fact - - that four years isn't a long time for us, but in the life of that child it's her whole life, and when you are a child and when you're only a few years old, it seems like forever. To upset her apple cart after four years, would be one of the most wicked, disreputable things that anybody could do to the child. And that's the only concern that I can have at this point - - is what's best for your child, not what's best for you, not what's best for them. And so the Court finds by clear and convincing evidence that because of the bond that's been created, because of the family that's been formed with the [G.s] and this child, because they're in a better position to support this child, that they have better stability in their home, that they have extended family and friends that love and support this child, because they're financially in better shape to provide for the child, and because they've stepped up to the plate for four years without anybody so much as patting them on the back or assisting them - - the Court finds it to be in the best interest of this child that the parental rights be terminated. And so it's the Order of the Court that the parental rights of [Mother] be and they hereby are forever terminated. There's already been a home study done. As soon as I take [Father's] surrender - - which we can do now - - then the child is available for adoption. There's no reason for any further study. The [G.s] are appropriate. They've had a home study done, passed the DCS home study, and have done an outstanding job by clear and convincing evidence of raising this child, and therefore they'd be fit and proper persons to adopt the child.

The Court makes that finding.

Mother appeals to this Court.

## **Discussion**

Though not stated exactly as such, Mother raises one issue on appeal: whether the Trial Court erred in finding that the ground of abandonment by willful failure to support had been proven to terminate Mother's parental rights to the Child. Also, while not raised by Mother, we will address the issue of whether the Trial Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated because this is the required second prong in a termination of parental rights case.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

As relevant to this case, Tennessee law provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102 (1)(A)(i) (2010).

We have discussed the willful character of abandonment for failure to support:

This court has consistently held that the term willfulness as it applies to a party's failure to support a child must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188–89 (Tenn. 1999). Indeed, "defining abandonment as the mere non-payment of support [is] unconstitutional because this language creates an irrebuttable presumption of abandonment, irrespective

-8-

of intent." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (citing *In re Swanson*, 2 S.W.3d at 188). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audry S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id*. "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id*. at 863–64. Additionally, " '[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.' " *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003–02247–COA–R3–PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

*In re Dylan H.*, E2010-01953-COA-R3-PT, 2011 WL 6310465, at *6 (Tenn. Ct. App. Dec. 16, 2011), *no appl. perm. appeal filed*.

We first address whether the Trial Court erred in finding that the ground of abandonment for willful failure to support had been proven to terminate Mother's parental rights to the Child. The Trial Court terminated Mother's parental rights on the solitary ground of willful failure to support in the four month period immediately preceding the filing of the petition to terminate parental rights. One of the central elements of our analysis is the Trial Court's unequivocal finding that Mother lacked any credibility. As our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

The Trial Court expressed its disbelief at Mother's account of why she could

not support the Child at several points. The Trial Court stated:

> Mom has attempted to contend that she wasn't able to provide support because she had become pregnant and couldn't find a job, and the Court just doesn't believe that. There's no question she got pregnant at some point during those four months, but the only - - absolutely only support for her assertion is her own testimony, which the Court doesn't believe regarding attempts to obtain employment. There wasn't a single job application presented to this Court. There wasn't a single turn-down letter saying, "You didn't get a job." There wasn't a single potential employer testifying about turning down the defendant's application for a job. In short, there was absolutely no corroboration of it, and it certainly wasn't unusual, based upon the testimony of [Mother's] work history for her to go without employment for whatever reason. As I probably had already indicated, the Court puts no stock in the allegation that she is disabled from working. You're absolutely not disabled from working. They need to make me the ALJ for the Social Security Administration. Twenty-six years old, you've got some potential, I guess. A mental health issue that's been addressed with medication - - that's a common - - commonly diagnosed and treated condition these days that doesn't prevent people from working. It certainly didn't ever prevent you from working when you had your few jobs before, nor did your alleged reading disability prevent you from working when you had your few jobs that you've had in the past. There's no medical proof as to any alleged back injury - - just, again, your own testimony. The Court finds it incredible, and doesn't believe it, and finds that you aren't disabled - - by clear and convincing evidence that you're not disabled - - that you need to get off your hind end and go to work like the rest of us. And therefore, I make the finding by clear and convincing evidence that you do have the capacity to provide support

While we do not endorse the unhelpful and harsh tone of the Trial Court's ruling, we do not find that the evidence in the record preponderates against the Trial Court's findings, or that clear evidence exists in the record such that would overturn the Trial Court's unequivocal credibility determination. According to her own testimony, Mother has a work history, albeit rather sporadic, at places such as Backyard Burger, Walmart, Ingles, and ACT. Mother, however, did not work during the relevant period and contributed practically nothing for the Child. The evidence in the record on appeal does not preponderate against the Trial Court's findings made by clear and convincing evidence that the ground was proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36–1–102 (1)(A)(i).

We next address whether the Trial Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated. As pertinent to this issue, Tenn. Code Ann. § 36-1-113 (i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (2010).

Based on the record before us, it is clear that it is in the Child's best interest that Mother's parental rights be terminated. Mother essentially has been an acquaintance to

the Child, rather than a mother. While Mother has engaged in visitations, the record overwhelmingly reflects that the Child has spent the vast majority of her life with the Petitioners and is well-entrenched, as it were, in the home of the Petitioners as a member of their family. While there is some evidence that Mother has taken certain belated efforts to improve her personal habits and increase personal responsibility as testified to by the case manager, these efforts have not borne substantial fruit.

Overall, Mother has demonstrated a pattern of irresponsibility and excuse-making. On the other hand, the Child is doing well in the Petitioners' home. The evidence in the record on appeal does not preponderate against the Trial Court's findings made by clear and convincing evidence that it is in the Child's best interest for Mother's parental rights to be terminated.

We find and hold that the Trial Court did not err in terminating Mother's parental rights to the Child. We affirm the Trial Court's judgment terminating Mother's parental rights to the Child.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are assessed against the Appellant, Jessica N., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE